```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
EDDIE A. RODRIGUEZ,                      :
                                         :        07CV3309
                    Plaintiff,           :        OPINION & ORDER
       -against-                         :
                                         :
MICHAEL J. ASTRUE,                       :
Commissioner of Social Security,         :
                                         :
                    Defendant.           :
-------------------------------------------------------x
```

**Hon. HAROLD BAER, JR., District Judge:[1]**

On April 25, 2007, Plaintiff Eddie A. Rodriguez ("Plaintiff") commenced this action to challenge the final determination by the Defendant, the Commissioner of Social Security ("Commissioner"), that the Plaintiff was not disabled within the meaning of the Social Security Act and thus not entitled to disability benefits. On September 4, 2007, the Commissioner moved for judgment on the pleadings on the grounds that the determination of the Administrative Law Judge ("ALJ") is supported by substantial evidence. On October 24, 2007, Plaintiff cross-moved this Court for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), seeking to reverse the Defendant's decision and to have the case remanded for the sole purpose of calculation of Plaintiff's benefits. Because the ALJ did not fail to apply the correct legal standard and his determination that Plaintiff is not disabled is supported by substantial evidence, I GRANT Defendant's motion for judgment on the pleadings.

## I. FACTUAL BACKGROUND[2]

**A.    Procedural History**

On September 14, 2005, the Plaintiff filed an application for disability insurance benefits that alleges disability beginning February 28, 2005 due to a post-traumatic stress disorder ("PTSD") that relates to his work at the World Trade Center recovery site after September 11, 2001. (Rec. 59-62.) The claim was initially denied on December 9, 2005. (Rec. 22, 23-26.) The Plaintiff also began to experience lower back pain and sought diagnosis and treatment from his primary care physician and a

---

[1] Giannina Berrocal, a Spring 2008 intern in my Chambers and a third-year law student at St. John's Law School, provided substantial assistance in the research and drafting of this Opinion and Order.

[2] The facts are derived from the administrative record ("Rec."), which was filed as part of the Government's answer.

specialist from April 2006 through June 2006.[3] Plaintiff subsequently requested a hearing, which was held via videoconference on June 14, 2006. (Rec. 13.) The claimant and his attorney appeared at the Goshen, New York hearing site, and the ALJ Brian W. Lemoine presided over the hearing from the White Plains, New York hearing office. (Rec. 29, 303-40.) Mr. Donald R. Slive, an impartial vocational expert, ("Vocational Expert") also appeared and testified at the hearing. (Rec. 13.) The period at issue in the hearing ran from February 28, 2005, the date on which Plaintiff claimed he became disabled due to his PTSD, to September 27, 2006, the date on which the ALJ issued his decision. (Rec. 13.) This period includes Plaintiff's claim of disability due to his lower back pain, for which he began treatment in April 2006. The Plaintiff admits and the ALJ noted that he meets the insured status requirements of the Social Security Action §§ 216(i) and 223 through December 31, 2009 based on his earnings record. (*Id.*; Pl. Brief 2.)

The ALJ considered the case *de novo* and issued a decision on September 27, 2006 finding that the Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act and thus not entitled to disability benefits. (Rec. 10-21.) The Appeals Council denied the Plaintiff's request for review on March 12, 2007. (Rec. 6-9.) On April 25, 2007, Plaintiff commenced this action to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). On September 4, 2007, the Commissioner moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), seeking an order to affirm his final decision. On October 24, 2007, the Plaintiff cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), seeking (i) to reverse the Commissioner's final decision, and (ii) to have the case remanded for the sole purpose of calculation of Plaintiff's benefits pursuant to 42 U.S.C. § 405(g).

**B.    Non-medical Evidence**

*Vocational Background.* The Plaintiff, who was born on February 2, 1971, was thirty-five years old at the time of the ALJ's decision. (Rec. 15 (ALJ Decision, Sept. 27, 2006)). He earned an Associate Degree in Law Enforcement in 1993. (Rec. 88, 310.) From 1992 through 1994, he worked as a bank security guard, and from 1994 through 2005, he worked as a police officer, first for the New York State Park Police, and then from 1999 through 2005, for the Port Authority of New York and New Jersey ("Port Authority"). (Rec. 83, 119, 311-12, 314.)

---

[3] The back pain appears unrelated to the World Trade Center recovery, but arose from activities related to his police work. (See intake notes in patient record by primary physician's Dr. Reed, Rec. 284.)

On September 11, 2001, the Plaintiff was deployed to the World Trade Center ("WTC") site to assist in rescue and recovery. (Rec. 312-313.) He worked for the next two years at the WTC site, during which time he developed increased anger, could not work with a partner, would lash out at the public, and had dreams of body parts. (Rec. 313, 315.) On February 28, 2005, the last day he worked, the Plaintiff had an episode of sweating and crying and his lieutenant required him to surrender his weapon and see Dr. Doris Francis, a staff psychologist with the Port Authority's Office of Medical Services. (Rec. 82, 113, 136, 313, 315).

**C.    Relevant Medical Evidence**

      1.    <u>Post-Traumatic Stress Disorder and Depression</u>

*Port Authority's Psychologist, Doris Francis, PhD.*  On his last day of work, February 28, 2005, the Plaintiff's lieutenant referred him to Dr. Doris Francis, a Port Authority staff psychologist whom he consulted twice monthly through October 2006. (Rec. 136.) The Plaintiff stated that for the previous four months, he had experienced feelings of depression, loss of appetite, and difficulty sleeping. *Id*. When next seen on March 7, 2005, he reported that he had been struggling with images of and sadness related to his work at the WTC recovery site. *Id*. During his counseling sessions with Dr. Francis, he spoke of emotional issues related to September 11, 2001, and his ex-wife, including sadness, anger and guilt. (Rec. 131-35.) On April 28, 2005, the Plaintiff reported increased difficulty sleeping and concentrating and on May 12, 2005, the Plaintiff was reported as being "very confused." (Rec. 202.) Dr. Francis reported that the Plaintiff's various psychological symptoms would preclude him from returning to work as a police officer. (Rec. 198-204.) Dr. Francis declined the Commissioner's request for her opinion about the Plaintiff's work-related mental abilities. (Rec. 128-30.) Her notes are part of the Record. Dr. Francis referred the Plaintiff to outside mental health treatment and over the course of the next year, the Plaintiff was treated by a psychiatrist, Dr. Richard Luria, and a psychologist, Dr. Paul Kleinman.

*Treating Psychiatrist, Richard Luria, M.D.*  On May 11, 2005, Dr. Luria began treating the Plaintiff. (Rec. 155.) Dr. Luria found that the Plaintiff, after working several months at the WTC recovery site, experienced increased anxiety, irritability, anhedonia,[4] insomnia, anorexia,[5] social withdrawal, loss of initiative, impaired concentration, guilt, a depressed mood, anergia,[6] and sensitivity

---

[4] Anhedonia is the total loss of pleasure in acts that normally give pleasure. <u>Dorland's Illustrated Medical Dictionary</u> 89 (29th ed. 2000) ("<u>Dorland's</u>").
[5] Anorexia is the loss of appetite for food. <u>Dorland's</u> 94.
[6] Anergia is the lack of energy. <u>Dorland's</u> 29.

to, and avoidance of, reminders of September 11, 2001, but denied hopelessness or suicidal ideation. (Luria May 11, 2005 Report, Rec. 159-60.)  Dr. Luria reported that the Plaintiff was well-groomed, articulate, spontaneous and cooperative. (Rec. 160.)  Dr. Luria found no psychotic phenomena and found the Plaintiff's sensorium[7] was clear, his cognitive faculties and orientation were intact, and his intelligence was within normal limits.  *Id*.  Dr. Luria diagnosed PTSD and major depressive disorder on Axis I; no diagnosis on Axis II; no diagnosis on Axis III; major stressor – witnessing a disaster – on Axis IV; and a 55 on Axis V.[8]  *Id*.  Dr. Luria prescribed anti-depressant medication and supportive therapy.  (Rec. 153, 155, 160, 163.)

On October 28, 2005, Dr. Luria reported that the Plaintiff's attitude, appearance, behavior, speech, thought perception, sensorium, intellectual functioning, insight and judgment were normal, and though his mood was depressed and his affect was constricted, he did not exhibit suicidal features. (Rec. 155-157.)  Dr. Luria found that the Plaintiff had a marked impairment of attention and concentration, would have difficulty following detailed instructions or schedules, and would be unable to tolerate any reminders of his past work and trauma as a police officer.  (Rec. 156-57.)  In addition, his abilities in maintaining pace and work attendance and in understanding and memory were impaired and the Plaintiff would be unreliable in his interaction with the public.  (Rec. 157.)

By February 3, 2006, Dr. Luria reported that most symptoms of the Plaintiff's depression had subsided, although he still had symptoms of PTSD.  (Rec. 264.)  In the Mental Capacities Evaluation form,[9] Dr. Luria opined that the Plaintiff had good abilities to follow work rules, relate to co-workers, use judgment, interact with supervisors, and function independently; he had poor to no abilities to deal with the public or deal with work stresses; and he had fair ability to maintain attention and concentration.  (Rec. 276.)  Dr. Luria found that the Plaintiff had unlimited/very good abilities to understand, remember and carry out simple and detailed job instructions; and had good abilities to

---

[7] Sensorium is the condition of a subject relative to the subject's consciousness or mental clarity.  Dorland's 1623.

[8] Dr. Luria's diagnoses reflect the use of a multi-axial system of assessment, where each axis refers to a different domain of information that may help the clinician plan treatment and predict outcome.  Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 27 (4th ed. Text Revision 2000).  Axis I refers to clinical disorders and other conditions that may be the focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions; Axis IV refers to psycho-social and environmental problems; and Axis V refers to global assessment of functioning ("GAF").  *Id*.  GAF refers to the individual's overall level of functioning and is assessed by using the GAF scale which provides ratings in ten ranges with higher scores reflecting greater functioning.  *Id*. at 32, 34. A GAF of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id*.

[9] The questionnaire defines "unlimited or very good" as a more than satisfactory ability; "good" as limited but satisfactory ability; "fair" as seriously limited ability, but not precluded; and "poor to none" as having no useful ability. (Rec. 276.)

understand and carry out complex job instructions. (Rec. 277.) Dr. Luria found that the Plaintiff had unlimited/very good ability to maintain his personal appearance, fair ability to relate predictably in social situations, and poor to no ability to demonstrate reliability. *Id*.

On March 7, 2006, Dr. Luria found that the Plaintiff had no limitation in his ability to understand, remember and carry out instructions, and a slight limitation in his abilities to appropriately interact with coworkers, respond to work pressures, and respond to changes in a routine work setting. [10] (Rec. 185-86.) The Plaintiff had a moderate limitation of his abilities to interact appropriately with the public and a marked limitation in interacting appropriately with supervisors. *Id*. Dr. Luria stated that Plaintiff was embittered and resentful over the loss of his police career and identity as a police officer and in his opinion, the Plaintiff was unable to perform his prior job as a police officer or other similar law enforcement positions. (Rec. 186; see also Rec. 146-47, 162, and 264.) Dr. Luria found that no other capabilities were affected by the impairment. (Rec. 186.)

*Treating Psychologist, Paul S. Kleinman, PhD.* Beginning in May 2005, the Plaintiff saw Dr. Kleinman weekly for symptoms related to PTSD and depression. (Rec. 140, 148.) On November 16, 2005, Dr. Kleinman found that the Plaintiff had dressed appropriately and his attitude was cooperative, but he could become belligerent when confronted, and was easily agitated. (Rec. 140.) His speech was normal, and perception was accurate and based in reality, his memory was intact, and his fund of information was wide-ranging. (Rec. 140-41.) The Plaintiff had been resistant to "moving forward" with regard to new hobbies or a new work situation, and his mood was anxious, angry, depressed, pessimistic and unstable, and his affect was labile and his attention and concentration were impaired. *Id.* Dr. Kleinman opined that the Plaintiff should minimize stress-related situations and avoid highly social situations, highly structured settings, and jobs that require a high degree of concentration. (Rec. 143.)

On January 2, 2006, Dr. Kleinman found that the Plaintiff had fair abilities to follow work rules, relate to co-workers, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention/concentration, and poor to no ability to deal with the public. (Rec. 254.) The Plaintiff had fair abilities to understand, remember and carry out complex job instructions, or detailed but not complex job instructions, and a good ability to understand, remember and carry out simple job instructions. (Rec. 255.) The Plaintiff had good abilities to maintain his personal

appearance, but only a fair ability to behave in an emotionally stable manner, related predictably in social situations, and demonstrate reliability; he could be volatile and lose his temper and sometimes acted before thinking; and he was "least" able to cope with stress or confrontational situations. *Id.*

On April 27, 2006, Dr. Kleinman found that the Plaintiff had a slight limitation of ability to understand and remember short simple instructions, and moderate limitation in the ability to carry out short, simple instructions and understand and remember detailed instructions, and marked limitations in his ability to carry out detailed instructions, and make judgments on simple work-related decisions. (Rec. 249.) The Plaintiff was anxious, defensive, depressed, angry, preoccupied with his overall state of affairs, and perceived danger everywhere. *Id.* Dr. Kleinman opined that the Plaintiff had a marked limitation in his ability to interact appropriately with supervisors and respond to work pressures in a usual work setting and the Plaintiff had only marginal ability to cope with change, pressure or anything confrontational. (Rec. 250.)

By June 7, 2006, the Plaintiff continued to be oriented and cooperative, had no signs of suicidal or homicidal ideation, or psychosis, but had low self-esteem, a pronounced inability to deal with frustration, and was unable to interact socially. (Rec. 272-73.) The Plaintiff was unable to focus on learning new tasks and that his treatment overall had resulted in many failures and few successes, as he remained resistant to moving forward. (Rec. 272.) In Dr. Kleinman's opinion, the Plaintiff could not perform his job as a police officer. (Rec. 144-45, 149-151.)

*State Agency Medical Consultant, Erlinda Gagan, M.D.*  Dr. Gagan reviewed the medical evidence relating to the Plaintiff and opined that he did not have an impairment that met or equaled the Listing of Impairments. (Rec. 167.) She did not file a report, but did complete a Psychiatric Review Technique form (Rec. 167-80), a Mental Residual Functional Capacity Assessment form (Rec. 181-83), and a Report of Contact from[11] (Rec. 166). This assessment was based in part on a telephone conversation with Dr. Luria on December 1, 2005, which Dr. Gagan undertook to resolve discrepancies in Dr. Gagan noted in Dr. Luria's assessments, which had found all objective mental

---

[10] The questionnaire defined "none" as having absent or minimal limitations; "slight" as having mild limitations, but generally functions well; "moderate" as having satisfactory ability; "marked" as having a serious limitation, but not precluded; and "extreme" as having no useful ability. (Rec. 185.)

[11] The Commissioner has conceded that the report did not meet with regulatory requirements. Under the Commissioner's regulations, when a treating source is recontacted by telephone to obtain clarification of a medical report, the telephone report must be sent to the source for review, signature and return. 20 C.F.R. § 404.1512(e)(1). Although Dr. Gagan contacted Luria by telephone, there is no indication that these steps were taken. (Rec. 166.) I agree with the Commissioner that Plaintiff was not prejudiced by the ALJ's reliance on Dr. Gagan's report of contact because Dr. Luria

status examination results "within normal limits," but showed impaired functional capacities. (Rec. 165.)

Dr. Gagan diagnosed the Plaintiff with PTSD. (Rec. 172.) In her opinion, the Plaintiff had moderate limitations in the ability to maintain concentration and attention for extended periods of time; the ability to work in coordination with or proximity to others without being distracted by them; the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; the ability to complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to respond appropriately to changes in the work setting. (Rec. 181-82.) Dr. Gagan also found the Plaintiff to have "moderate" difficulties in maintaining concentration, persistence and pace. (Rec. 177.)

    2. Lower Back Pain

*Treating Primary Care Physician, Thomas M. Reed, M.D..* On April 26, 2006, Dr. Reed examined the Plaintiff for a complaint of back pain that he described as intermittent over the past two years, but which worsened over the past two to three months. (Rec. 284.)[12] The straight leg-raising test ("SLR") was negative and motor strength was full, at five out of five. *Id.* Dr. Reed prescribed Naprosen and Flexeril. *Id.* On May 9, 2006, the SLR was negative again and his strength was five out of five. (Rec. 283.) Dr. Reed assessed low back pain for which he prescribed Darvocet, and, though he found that the Plaintiff was alert and oriented, noted the Plaintiff's complaints of intermittent lightheadedness. *Id.* Dr. Reed ordered a magnetic resonance imaging scan ("MRI") of the lumbar spine, which revealed L4-L5 disc herniation encroaching upon the left L5 nerve root within the neural foramina without compression, and a L5-S1 disc herniation encroaching upon the S1 nerve root within the central canal without compression. (Rec. 269.) On June 19, 2006, Dr. Reed prescribed physical therapy for the disc herniation. (Rec. 286.) On July 6, 2006, Dr. Reed reported on a Medical Assessment of Ability to Do Work Related Activities (Physical) that the Plaintiff could lift less than five pounds and stand and/or walk a total of up to five minutes within an eight-hour workday. (Rec. 279.)

---

subsequently provided medical opinions regarding the Plaintiff's functional limitations. (Rec. 185-86, 277.) As explained below, the ALJ properly evaluated the conflicting medical opinion evidence in relation to the record as a whole.

[12] The entry in the chart notes that the Plaintiff is a policeman carrying a gun belt and on feet most of the day. See notes in patient record co-signed by Dr. Reed on April 26, 2006. (Rec. 284.)

*Treating Physician, Dr. Jack McNulty, Specialist, Neurosurgery*. On June 6, 2006, Dr. McNulty conducted a physical and neurological examination of the Plaintiff. The examination revealed average muscle bulk and tone, full motor strength, at five out of five, normal sensation, and equal reflexes. (Rec. 267.)[13] The SLR was normal. *Id*. In the lumbar spine, the Plaintiff was able to flex forward greater than 90 degrees and extend greater than 15 degrees. *Id*. There was no evidence of muscle spasm or tenderness. *Id*. Dr. McNulty found no perceived weakness, or difficulty with his gait. (Rec. 266.) Dr. McNulty found normal neurological functions including orientation, memory, both recent and remote, normal attention span and concentration, normal language skills, and average general knowledge. *Id.* Dr. McNulty reviewed the MRI, which showed degenerative disc disease and assessed that the Plaintiff had "chronic lower back pain, non-radicular" and prescribed physical therapy twice a week for six weeks. (Dr. McNulty prescription and report Rec. 123, 267-68; see also Pl. Admin. Hrg Request, Rec. 120-21.)

*Consultative Examiner, Dr. Steven Calvino*. On August 10, 2006, Dr. Calvino, an orthopedist, conducted a consultative orthopedic evaluation of the Plaintiff. (Rec. 289-91.) Dr. Calvino observed that the Plaintiff's gait and station were normal. (Rec. 290.) He could walk on his heels and toes and squat fully. *Id*. The Plaintiff did not need help in changing clothes for the examination nor in getting on and off the examination table. *Id*. Examination of the Plaintiff's cervical, thoracic, and lumbar spine revealed full ranges of motion and no spasm. (Rec. 290-91.) The SLR test was negative. (Rec. 291.) The Plaintiff also had full range of motion of his extremities. *Id*. His muscle strength was full, and there was not muscle atrophy or sensory abnormality. *Id*. Dr. Calvino reported that, based on his examination, the Plaintiff had no physical restrictions including lifting, standing and/or walking. (Rec. 291-95.)

**D.     Hearing Testimony**

*Plaintiff's Testimony*. The Plaintiff testified that as a result of PTSD, he lost interest in his personal appearance, exercise and diet, housework, hobbies, and personal finances and relies on his family to help maintain his house. (Rec. 317-323.)[14] He testified that he was quick to anger and had difficulty paying attention and completing tasks because of thoughts of "the past." (Rec. 313, 318.) He testified that he no longer watches television, has to take sleeping pills to sleep, and suffers severe migraine headaches approximately every two weeks. (Rec. 317-19.) He leaves his home to see his

---

[13] The record reflects this incorrectly as Dr. Luria's report attached to a letter from the Plaintiff's counsel. However, it is Dr. McNulty's report dated June 6, 2006, which the Court noted it had reviewed during the hearing. (Rec. 327-328.)

children, attend medical appointments and dine out, but avoids socializing with friends and going outside for fear he will become angry and upset. (Rec. 97, 191, 313, 320-21.) Plaintiff also testified that he has developed "throbbing" back pain, which limits his ability to sit and stand for more than ten to fifteen minutes at a time and further contributes to his inability to work because of the discomfort and the back pain medication which makes him drowsy. (Rec. 319, 325-26.) The ALJ inquired about the medical assessments of Plaintiff's condition and the Plaintiff testified that his primary physician had referred him to a back specialist, Dr. McNulty, who advised against surgery and instead prescribed physical therapy, which the Plaintiff had not yet begun. (Rec. 327-28.)

*Vocational Expert Testimony*. At the administrative hearing, after interviewing the Plaintiff the ALJ heard the testimony of a vocational expert, Mr. Slive. The ALJ asked the vocational expert to hypothetically consider an individual of plaintiff's same vocational profile, who was limited to exertionally light work,[15] could only perform simple, routine, repetitive tasks and only occasionally interact with supervisors, coworkers, and the general public. (Rec. 332.) The ALJ asked the vocational expert to identify the jobs, if any, that such an individual would be able to perform. (Rec. 332.)

The vocational expert responded that a person with the Plaintiff's vocational profile would be unable to perform the Plaintiff's prior work of law enforcement, but would be able to perform the unskilled light jobs of electric sealing machine operator,[16] assembly/machine tender,[17] and power-screw driver operator.[18] (Rec. 332-33.) When the additional restriction was added that the hypothetical person could not operate hazardous machinery due to medication, the vocational expert testified that the person would be limited to about twenty-five percent of the jobs available to a person without that restriction, including the job of assembler of small products I[19] and assembler of small products II.[20] (Rec. 335-36.) When the ALJ added the further limitation of a person only able to maintain concentration for about a third of the workday, the vocational expert testified that he would be unable to identify any jobs in the regional or national economy that such a hypothetical person

---

[14] See also self-completed Function Report, completed by the Plaintiff on October 14, 2005. (Rec. 92-99.)

[15] Light work involves lifting no more than twenty pounds at a time, with frequent lifting or carrying of objects weighting up to ten pounds. 20 C.F.R. § 404.1567(b). Light work may also require a good deal of walking, or sitting most of the time with some pushing or pulling of arm or leg controls. *Id.*

16 Dictionary of Occupational Titles Job Code No. ("DOT") 690-685-154 (4th ed. rev. 1991), WL DICOT 690.685-154, of which there were 27,300 positions nationally and 1,950 locally.

17 DOT 754.685-014, WL DICOT 754.685-014, of which there were 17,540 positions nationally and 358 locally.

18 DOT 699.685-026, WL DICOT 699.685-026, of which there were 17,540 positions nationally and 358 locally.

19 DOT 706.684-022, of which there are 9,500 positions nationally and 1,820 locally.

could do.  (Rec. 333.)  When Plaintiff's attorney asked the vocational expert if he could identify any positions for a hypothetical person that was unreliable and based on a translation of unreliability to an absence of three or more times a month, he again testified he could not.  (Rec. 337.)

## II. DISCUSSION

"A [federal district] court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  "On review, [a court] may only set aside a determination which is based upon legal error or not substantiated by substantial evidence."  Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  If the Commissioner's determination as to any fact is supported by substantial evidence, the decision shall be conclusive.  Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).  The Court is "precluded from undertaking a *de novo* standard of review."  Valentin v. Barnhart, 2004 WL 2366176, at *2 (S.D.N.Y. Oct. 21, 2004).  Moreover, a court must affirm the Commissioner's decision if there is substantial evidence to support the conclusion, even if "the district court might have ruled differently were it to have made the initial determination."  Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).

Substantial evidence has been defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richadson v. Perales, 402 U.S. 389, 401 (1971).  The court must look at the supporting evidence "in light of the other evidence in the record that might detract from such finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn."  Beckles v. Barnhart, 03 Civ. 1184, 2004 WL 2327925, at *1 (E.D.N.Y. Oct. 13, 2004).  If the Court finds that there is substantial evidence supporting the Commissioner's decision, it must be upheld, even if there is also substantial evidence supporting the plaintiff's position.  Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990).

The Social Security Act (the "Act") defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."[21]  42 U.S.C. § 23(d)(1)(A).  The Act further establishes that an individual will be deemed disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to

---

[20] DOT 739.687-030, of which there are 13,450 positions nationally and 972 locally.
[21] In addition, to be entitled to disability insurance benefits a claimant must also meet the insured status requirements of 42 U.S.C. § 423(c).  The Plaintiff satisfies these requirements through December 31, 2009.  (Rec. 17, 74.)

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*.

The Commissioner has established a five-step sequential analysis for evaluating disability. 20 C.F.R. § 404.1520(a)(4). "First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities." Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). If the claimant suffers such impairment(s), the third inquiry is whether, based solely on the medical evidence, the claimant's impairment(s) meets or equals one of those in the Listing of Impairments[22] and meets the duration requirement. If so, the Commissioner will find the claimant disabled on the presumption that the claimant is unable to perform substantial gainful activity. *Id*. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment(s), he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner must then determine whether there exists in the national economy substantial gainful work which the claimant could perform, taking into account his physical and mental capabilities and other vocational factors as the claimant's age, education, training and work experience. *Id*. The claimant bears the burden of proof as to the first four steps, while the Commissioner must prove the final one. *Id*.

After reviewing the record and holding the hearing, the ALJ made the following findings of fact and conclusions of law. (Rec. 13-21.) The Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2009. (Rec. 17.) The Plaintiff satisfied the first criteria because he was not employed at the time of his application. Under the second criteria, the ALJ found the claimant suffered from the following "severe impairments: back pain secondary to disc herniations at L4-5 and L5-S1, a depressive disorder, and PTSD (20 CFR § 404.1520(c))." (Rec. 17.) While the Plaintiff had mild limitations to conduct activities of daily living and moderate restrictions relative to

---

[22] The Listing of Impairments, set forth in Appendix 1 of 20 C.F.R. Part 404, Subpart P, describes for each of the major body systems impairments that are considered severe enough to prevent an individual from performing any gainful activity, regardless of his or her age, education or work experience. 20 C.F.R. § 40.1525. Paragraph (B) of both §§ 12.04 and 12.06 are identical. They require at least two of the following: (i) marked restriction of activities of daily living; or (ii) marked difficulties in maintaining social functioning; or (iii) marked difficulties in maintaining concentration, persistence, or pace; or (iv) repeated episodes of decompensation, each of extended duration. Decompensation is an exacerbation or temporary increase in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence and pace. See App. 1 to 20 C.F.R. Part 404 Supbart P, §12.00C.4

sustaining social functioning and maintaining concentration, persistence and pace, there was no decompensation. (Rec. 18.) Nonetheless, the ALJ held in the third step that the Plaintiff "[did] not have an impairment or combination of impairments that met or was medically equal to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526)."[23] *Id.*

The ALJ found that the Plaintiff is unable to perform any past relevant work for step four, (Rec. 19), but he nonetheless had the residual functional capacity to perform light work including simple, repetitive, rote tasks and no greater than occasional interaction with co-workers, supervisors or members of the general public at the fifth step. (Rec. 17.) Because of the Plaintiff's age, background, and the finding of residual functional capacity, there are jobs in significant numbers in the national economy that the Plaintiff could perform, including unskilled work, and thus the Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. (Rec. 19-21.)

Specifically, with respect to the third step, the Plaintiff argues that the ALJ committed legal error because the ALJ failed to properly assess the mental function of the Plaintiff because the ALJ: 1) did not cite Dr. Francis's opinion or records; 2) failed to give controlling weight to Dr. Luria's and Dr. Kleinman's more restrictive findings; and 3) improperly relied upon Dr. Gagan's assessment, which was based in part on a conversation with Dr. Luria, which did not comply with Commissioner regulations for verification. The Plaintiff also contests the ALJ's determination of physical limitations which lead to a finding that the Plaintiff could perform light work because: 1) the ALJ should have given controlling weight to Dr. Reed, the primary care physician's opinion that the Plaintiff was not capable of even sedentary work; and 2) the ALJ should not have "substituted" his own opinion about the Plaintiff's gait and physical capacity based on his attendance at the hearing.

The Plaintiff argues that the ALJ incorrectly found residual functional capacity for light work in step five of the disability analysis. Consequently, the Plaintiff argues that the Vocational Expert testimony must be disregarded since it was based on the unsubstantiated RFC. In addition, the Plaintiff argues that the ALJ should have accepted the Vocational Expert's response that there are no potential jobs in the national economy where an individual may expect to be absent three times a month. I

---

[23] "Specifically, [the ALJ stated that] there is no documentation of any motor, sensory or reflex deficits within the context of medical listing 1.04A, which pertains to spinal disorders. There is similarly no clinical basis for assessing marked restrictions in any of the four Part B categories applicable to mental disorders under section 12.00, including 12.04 or 12.06. It is noted that the state agency medical consultants who evaluated the evidence of the record at the previous stage of administrative review also failed to find that any medical listing had been met or equaled."

disagree with most of the points advanced by Plaintiff's attorney and find that the ALJ supported his findings with substantial evidence.

Reviewing the entire record, the ALJ properly found that the Plaintiff had only moderate limitations in the area of concentration, persistence and pace, and that the Plaintiff had some limitations, but normal cognitive functioning. The ALJ did in fact rely upon the entire record including all treating physicians as well as the state consultative physician. The ALJ did not commit reversible error by failing to specifically cite to Dr. Francis' treatment notes because the ALJ is not required to mention every item of testimony presented particularly where such evidence is amply supported elsewhere. See Mongueur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983). Dr. Francis declined to complete the questionnaire to assess plaintiff's mental work-related abilities. Moreover, her assessments of depression and PTSD symptoms are all adopted by Drs. Luria and Kleinman, both of whom completed mental capacities assessments over the course of their treatment of the Plaintiff, even though Dr. Francis did not.

Even if the ALJ were to give controlling weight under 20 C.F.R. § 404.1527(d)(2) to the treating psychiatrist and psychologist, their own evidence does not support a finding of disability.[24] Dr. Luria's finding of marked impairment of attention and concentration in October 2005 is undermined by Dr. Luria's subsequent findings as of February 2006 that his attention and concentration was fair. This is bolstered by Dr. Kleinman's finding as early as November 16, 2005 that the Plaintiff's ability to maintain attention and concentration was fair. Moreover, each report by all the psychiatrist and psychologists show that the Plaintiff had unlimited capacity to handle simple or detailed job instructions and moderate ability to handle complex instructions. Thus, to the extent there was conflicting medical opinion evidence, the ALJ was entitled to select between the conflicting opinion evidence in the record and adopt the less restrictive assessments because of their consistency with the record as a whole and the Court is not entitled to re-weigh the evidence. See Alston v. Sullivan, 904 F.2d at 126.

The Plaintiff contends that the ALJ did not address evidence of flashbacks or discuss whether

---

[24] The ALJ's comment that he took account of "Dr. Luria's concession that the claimant 'is not totally disabled. He is able to do work that is unrelated to law enforcement'" (ALJ Opinion, Rec. 19) did not cause prejudice to the Plaintiff. The opinion of disability is reserved to the Commissioner, 20 C.F.R. § 404.1527(e)(1). Dr. Luria's later reports no limitations for following instructions and only slight restrictions to work with the public and others and to respond to work pressures and changes. See March 7, 2006 Medical Source Statement of Ability to Do Work-Related Activities (Mental) (Rec. 185-87). The only marked limitation in interaction with supervisors. Id. at 186. Dr. Luria noted no other capabilities affected by the impairment.

these flashbacks were hallucinations or delusions. (Pl. Br. 18.) However, he noted no doctor reported that the Plaintiff suffered hallucinations or delusions. Dr. Luria's progress notes marked off solely depression; the boxes for hallucination or delusions were left blank. (Rec. 17-18, 140, 157, 160, 190-92, 205-06, 273.) Thus, taking the treating physicians' notes and reports as well as the non-examining consulting psychiatrist, Dr. Gagan, I affirm the ALJ's finding that the Plaintiff does not suffer any marked limitations to meet a listed impairment under Paragraph (B) of 12.04 and 12.06.

The ALJ properly considered the treating physicians' opinions with respect to physical limitations. (Rec. 17-18.) Dr. McNulty, a neurosurgeon, provided an assessment of the Plaintiff's physical disability based on his examination of June 6, 2006, denoted as Exhibit 12F. Dr. McNulty found few limitations.[25] It is interesting to note that Plaintiff's counsel cited to Dr. McNulty's report and his diagnosis in the request for an administrative hearing, but fails to mention it in his papers. (Rec. 120-21.) The ALJ noted that he relied on the report during the hearing clearly identifying the report as Dr. McNulty's and in his opinion, referring to it as 12F. (Rec. 326-327.) Thus, the ALJ did not merely rely on the consultative examiner, Dr. Calvino in finding that the Plaintiff's back problems permitted him to do light work. Dr. McNulty found that the Plaintiff had no limits and the treatment plan was very conservative – physical therapy, not surgery. This specialist's opinion was entitled to more weight than the generalist, Dr. Reed under 20 C.F.R. § 404-1527(d)(5). Moreover, Dr. McNulty and specialist consulting physician Dr. Calvino were consistent and supported by objective evidence. (Rec. 18 citing Exhibits 12F and 16F) These specialists' opinions are more consistent with the record as a whole. 20 C.F.R. § 404.1527(d)(4).[26]

The ALJ provided a detailed explanation as to why Dr. Reed a treating physician, who would ordinarily be entitled to more weight than non-treating physicians, was not so entitled here and why his disability assessment should be given limited weight.[27] (Rec. 18 citing Exhibit 15F.) The ALJ held that Dr. Reeds's finding of inability to perform even sedentary work was wholly inconsistent with the

---

[25] The Commissioner makes the same error in assuming that this is not Dr. McNulty's report, despite the source mark from the fax identification. This is probably because the Plaintiff's counsel attached it improperly to the cover letter identifying it as a report from Dr. Luria.

[26] 20 C.F.R. § 404.1527(d)(4) states:
   Consistency. General, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

[27] 20 C.F.R. § 404.1527(d)(2) states:
   Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that

objective medical findings in Dr. McNulty's and Dr. Calvino's reports. (Rec. 18.) The Plaintiff was found to have range of motion in the cervical spine and thoracic and lumbar spines as well as full strength in upper and lower extremities. Dr. Reed offered no such findings, but relied solely on the MRI results to support his severe limitations. 20 C.F.R. § 404.1527(d)(3).[28] Moreover, Dr. Reed is only a generalist and the opinions of the two specialists who examined the Plaintiff deserve more weight. 20 C.F.R. § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialty"). The record supports a determination that the Plaintiff is capable of light work due to his physical limitation of chronic lower back pain.

The ALJ also properly considered the Plaintiff's subjective complaints about his pain and physical limitations and limited the specialists' findings of no restrictions for the Plaintiff to light work due to Plaintiff's testimony. The ALJ may consider his or her own observations of the individual as part of the overall evaluation of the credibility of the individual's statements. SSR 96-7p, 61 Fed.Reg. 34,483, at 34,486 (1996). However, this must be done in light of the medical findings and other evidence, regarding the true extent of the pain alleged by the claimant. Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984). The ALJ did balance the subjective complaints and his observations of the Plaintiff during the hearing with the objective medical findings in compliance with 20 C.F.R. § 404.1529(a). See 20 C.F.R. § 404.1529(a) ("statements about your pain" alone are insufficient; "there must be medical signs and laboratory findings which show that you have a medical impairment(s)").

Turning to the fifth step of the eligibility determination, I find that the ALJ's determination that the Plaintiff "has the residual functional capacity to perform light work (20 CFR § 404.15567(b)), involving simple, repetitive, rote tasks and no greater than occasional interaction with coworkers, supervisors or members of the general public" is supported by substantial evidence supplied by the treating and non-treating physicians as well as Plaintiff's own testimony as noted above. (Rec. 17.)

Finally, reviewing the record as a whole, the ALJ need not and did not address the three absences per month urged as fair by Plaintiff's counsel during the hearing. This absenteeism, which counsel suggested as a "translation" of Dr. Kleinman's and Dr. Luria's low assessment of the

---

cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

[28] While the treating physicians are given more weight than non-treating or consultative physicians under 20 C.F.R. § 404.1527(d)(3), such treating source opinions must be well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the claimant's case record. 20 C.F.R. §404.1527(d)(3).

Plaintiff's capacity for reliability was not otherwise supported by any evidence from any physician or psychologist. In February 2006, Dr. Luria scored the Plaintiff's ability to demonstrate reliability as poor to none (Rec. 277), whereas in January 2006, Dr. Kleinman scored this ability as fair (Rec. 254). Neither elaborated upon the meaning or implication of reliability. Dr. Kleinman noted in the space for further description in the Making Personal Adjustment-Social Adjustments Section, where reliability is scored, that the Plaintiff had a temper and could be volatile, which is hardly a relevant consideration on the issue of reliability (Rec. 254); whereas Dr. Luria had no further comment whatsoever (Rec. 277). Again, in Dr. Luria's final Mental Capacities form from March 2006, he cited no limitations as to reliability or provided any indication that absenteeism would be a problem. (Rec. 185-86.)

Because there is no factual basis in the record to support the hypothetical assumption of absenteeism put to the vocational expert, his opinion is "meaningless." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983) (citing Brittingham v. Weinberg, 408 F. Supp. 606, 614 (E.D. Pa. 1976). The ALJ is responsible for determining, based on all the evidence, the claimant's capabilities. Id. at n.4. It was well within the ALJ's purview to find that the Plaintiff is able to perform simple, repetitive and rote tasks that are involved in unskilled work and this is supported by ample evidence in the record. The determination that Plaintiff is not disabled under the rules promulgated by the Social Security Administration is affirmed.

## IV. CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion and grants the Commissioner's motion for judgment on the pleadings on the grounds that the ALJ applied the correct legal standard and the determination of the ALJ that Plaintiff is not disabled is supported by substantial evidence. The Clerk of the Court is instructed to close any pending motions and remove this matter from my docket.

SO ORDERED
New York, New York
May __, 2008

_____
U.S.D.J.

- 16 -